1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10 THEODORE BLACKMON,                    )    1:09-CV-01138 AWI SMS HC
                                        )
11              Petitioner,             )    FINDINGS AND RECOMMENDATION
                                        )    REGARDING PETITION FOR WRIT OF
12      v.                              )    HABEAS CORPUS
                                        )
13                                      )
   ROBERT HOREL, Warden,                )
14                                      )
                Respondent.             )
15 _____ )

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

18
                              **PROCEDURAL BACKGROUND**
19
            Petitioner is currently in the custody of the California Department of Corrections pursuant to
20
   a judgment of the Superior Court of California, County of Kern, following his conviction by jury
21
   trial on March 12, 2007, of one count of premeditated murder (Cal. Penal Code § 187(a)), one count
22
   of attempted murder (Cal. Penal Code §§ 664/187(a)), and one count of being a felon in possession
23
   of a firearm (Cal. Penal Code § 12021(a)(1)). (LD[1] 4:2-3.)  Allegations of premeditation,
24
   deliberation, a gang-murder enhancement, additional firearm use enhancements, and an enhancement
25
   for committing the offense for the benefit of a criminal street gang were found to be true. (LD 4:2-3.)
26
   In a bifurcated proceeding, Petitioner admitted allegations of prior convictions pursuant to
27

28      _____
             [1]"LD" refers to the documents lodged by Respondent with his response.

1  California's three strikes law. (LD 4:3.)  The court sentenced Petitioner to the following: (1) count 1-

2  life without the possibility of parole, plus 25 years to life for the firearm use enhancement; (2) count

3  2 - a consecutive term of 30 years to life, plus 20 years for the firearm use enhancement; (3) counts 1

4  and 2 - a five-year term and one-year term on each count for the prior serious felony and prior prison

5  term allegations; and (4) count 3 - a consecutive total determinate term of four years and four

6  months, based on a one-year four-month term, plus one year for the gang enhancement and a total of

7  two years for the prior conviction and prior prison term enhancements. (LD 4:3.)

8          Petitioner appealed to the California Court of Appeals, Fifth Appellate District (hereinafter

9  "Fifth DCA"). On November 18, 2008, the judgment was affirmed in a reasoned opinion. (LD 4.) On

10  December 29, 2008, Petitioner filed a petition for review in the California Supreme Court. (LD 5.)

11  On January 28, 2009, the petition was summarily denied. (LD 6.)

12          On June 30, 2009, Petitioner filed the instant federal habeas petition.  Petitioner raises one

13  ground for relief: He claims the evidence was insufficient to find him guilty of committing the

14  murder. Respondent filed an answer to the petition on September 17, 2009. Petitioner filed a traverse

15  on October 22, 2009.

16                                    **FACTUAL BACKGROUND**[2]

17          In July 2005,[FN3] business partners Mark Young and Damon Moore, their employee
     Kathy Crump, and her boyfriend, Bural Trevan Wilkins, were traveling from Sacramento to
18  Las Vegas in a rented mid-sized sports utility vehicle (SUV). They were making the trip to
     celebrate Moore's impending marriage. Young was driving and Moore had fallen asleep in
19  the front passenger seat; Crump and Wilkins were passengers in the back seat.

20          FN3. Dates in the Statement of Facts are in 2005 unless otherwise stated.

21          Early the morning of July 15, Young exited the highway in Bakersfield to get gasoline
     and coffee, and pulled into a gasoline station that shared space with a fast-food restaurant.
22  The station was well-lit and there were lots of people around. Young parked the SUV at a
     gasoline pump with the driver's side closest to the pump and went into the station to pay for
23  the gasoline. Crump and Wilkins got out, went to the back of the SUV and lifted up the
     hatch; Wilkins was going through the luggage to find flip-flops he wanted to change into and
24  Crump was showing Wilkins what she had packed for him. When she got out of the SUV,
     Crump left the right rear passenger door wide open. Moore was asleep inside the SUV.

25
26          Young returned to the SUV. While he was standing by the SUV, Young noticed a
     Black man walking toward the vehicle. Young looked over the SUV's hood and got a one-

27  ────────────────

28          [2]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28
     U.S.C. § 2254(e)(1).

second glance at the man's face and upper body. Young thought the man's eyes looked odd; they were kind of "glossy," as if he were on drugs. This was the only time Young saw the man's face. The man continued walking while Young turned his attention back to pumping gas.[FN4]

> FN4. A trial, Young, who is six feet, two inches tall, described the man as shorter than him, maybe five feet eight inches to five feet ten inches tall, 160 pounds or less, with one eyelid "kind of shut" and "kinda lower than the other." Young also described the man as having a medium complexion and a small mustache, and testified he was not wearing a hat or glasses.

Crump, who was still standing with Wilkins at the back of the SUV, also noticed the man walking across the gasoline station's lot. The man did not appear to be coming from a vehicle or going towards the station's store. Crump noticed him because he was dressed "totally different" than everyone else at the station and she thought he was cute. At trial, Crump described him as being "clean-cut," meaning he was neat; he had on a nice shirt, which she described as a blue short-sleeve, button-up shirt with a pattern on it, and clean shoes, which she said were ankle-high hiking-type boots which were yellowish-orange in color. His shirt was untucked and he had on long, blue jean shorts. The man was not wearing a hat. Crump did not remember if he had jewelry on, and although she could see his arms from right above the elbows down, she did not remember seeing any tattoos on his arms or body. He had a fade haircut, longer on the top and short in the back; Crump did not remember the man having any facial hair. Crump, who is five feet four inches tall, testified the man was a little taller than her.

The man walked past the SUV. Both Crump and Wilkins heard him say, "I see you, baby." Crump turned to look in his direction to see who he was talking to and saw an older model tan car with a brown top passing by. It looked like the man and the person in the car, who was a Black male, were nodding their heads at each other. Crump saw two people inside the car and noticed the front passenger was a woman. Wilkins also looked in the direction of the voice after the man's statement, which was the first time he noticed him. Wilkins thought the man and the person in the car knew one another.

Crump turned her attention back to the SUV. Out of the corner of her eye, Crump saw the man walk past her toward the front of the SUV and the door she left open. Wilkins also saw the man walk towards the SUV with his right hand in his pocket. As he was walking the man glanced briefly over at Wilkins, who was able to see his whole face. Wilkins had a clear view of the man as he walked toward him. At trial, Wilkins estimated the man's height as the same as his, five feet six inches, and described him as wearing a loose, short-sleeve dark blue, gray and white striped, button-down shirt that was not tucked in, blue jean shorts that fell below his knees, and white tennis shoes. He did not have anything covering his head and Wilkins did not see any jewelry or tattoos. Wilkins testified the man was clean-shaven, with the exception of a lightly-shaved, thin mustache, and his hair was very short, like a taper cut.

As Wilkins and Crump watched, the man walked up to the SUV's door that Crump had left open, pulled out a handgun, which Crump and Wilkins believed to be a revolver, and shot Moore in the head. Crump was standing at the back of the SUV, with the hatch open; she was looking around the back of the SUV at the man as he pulled the gun from his pocket, and looked directly at him as he shot Moore. Wilkins saw the man point the gun at Moore; the SUV did not obstruct his view.

After the shot was fired, Crump froze and Wilkins ran toward the restaurant to get help. The man turned towards Crump and fired a shot at her that went past her as she felt what she believed to be gunpowder burn her right cheek. They were looking at one another, face to face, when the man fired the shot. This was the only time Crump saw the man's face;

1   she was looking down the gun, which he was holding with only his right hand, into the man's
2   eyes. Although the gun hid a portion of the man's right eye, Crump thought she "got a really
    good look at him." Crump fell to the ground on her knees. The man ran away.

3           Wilkins heard the second shot as he ran. A window at the station shattered. Wilkins
4   turned and saw Crump down on the cement. Because he did not know whether Crump had
    been shot, he went back to the SUV.

5           Young dropped to the ground when he heard the shots fired. When he stood up,
6   Young saw Moore's head tilted back and blood gushing out of his nose. Moore had been shot
    twice behind the right ear and, according to the pathologist who performed his autopsy, died
7   within a few seconds of being shot. As there were no powder burns around the entrance
    wounds, the pathologist estimated the firearm's muzzle was at least 12 inches from Moore's
8   head when the shots were fired.

9           Within seconds of the gunshots, on-duty Bakersfield Police Officers John Billdt and
    Nate Anderberg, who heard the gunshots while they were picking up food from the fast-food
10  restaurant's drive-thru, drove into the gasoline station's lot to try to determine the gunfire's
    origin. Officer Billdt did not see any shooting victims in the area of the gas pumps. He made
11  a radio broadcast that shots had been fired at the station and the officers circled the area in
    search of a suspect without success. Officer Anderberg documented the time of the shooting
12  as 0117 hours.

13          At trial, Young identified Blackmon as the man who walked up to the SUV just
    before Moore was shot, and testified he was 80 to 90 percent certain of the identification
14  based on Blackmon's size. Crump and Wilkins also identified Blackmon at trial as the
    shooter; Crump testified Blackmon "look[ed] like the same person." The jury was shown a
15  July 15 video recording from the gasoline station's security camera. Crump, Wilkins, Young
    and the shooter are visible on the recording, as is other information the witnesses described,
16  including the tan and brown vehicle and the police car that was at the fast-food restaurant
    when the shooting occurred.

17  *The Police Investigation*

18          Bakersfield Police Officer Daniel McAfee responded to the dispatch regarding the
    shooting. Officer McAfee saw a Black male in the SUV's front passenger seat bleeding from
19  his head and nose. Officer McAfee noticed a man, later identified as Ricky Burns, standing
    just outside the crime scene tape. Officer McAfee spoke with Burns and made a report of this
20  contact.[FN5]

21          FN5. Officer McAfee was called as a defense witness later in the trial.

22          Bakersfield Police Officer Eric South also responded to the scene and spoke with
    Crump and Wilkins. Wilkins described the shooter as a Black male, in his 20's, five feet
23  seven inches tall, wearing a light blue shirt and long blue jean shorts. The police took Crump,
    Wilkins and Young to look at a suspect, but he was a Hispanic male who did not resemble
24  the shooter.

25          Detective Daniel Stevenson, the lead investigator, had brief conversations with
    Crump, Wilkins and Young at the crime scene. The three witnesses were taken to the police
26  station to be interviewed. After Detective Stevenson interviewed them, he asked Crump and
    Wilkins, but not Young, to help prepare composite likenesses of the shooter on a
27  computer.[FN6] Crump said she wouldn't mind doing that, but when Detective Stevenson told
    her she could clarify any of the facial features or anything else she saw with the lab
28  technician, she responded "I didn't really look at his face that much." Detective Stevenson did

not discuss with her when she saw the shooter's face or for how long, but it was evident to him from speaking with her that she had seen the shooter's face when he shot at her.

FN6. According to Detective Stevenson, Wilkins told him the suspect was a Black man in his early to mid 20s, five feet six inches tall, 150-155 pounds, with a faded haircut, i.e. shaved on the side with a little hair on the top. Wilkins said the man was "smooth shaved," maybe with a thin mustache. The man wore a button-down shirt, which was blue plaid with thin white stripes. Wilkins thought the man wore white tennis shoes, but he didn't look that closely because he was focusing on the man's upper body. According to Detective Stevenson, Crump told her the suspect was "barely taller" than she was, maybe five feet six inches to five feet seven inches tall, with a short afro, wearing a very long and baggy baby blue button-up shirt, in his mid to late 20s or "maybe early thirties."

Wilkins and Crump worked separately with Bakersfield Police Department crime lab technician Rebecca Stokes to come up with a composite sketch of the person who shot Moore. The composites were pieced together using a computer composite sketch program which contains databases of facial features, including foreheads, chins, noses, mouths and eyes. Stokes explained to both Wilkins and Crump that while the program uses real features from real human beings, they had to understand it would not be an exact likeness of the perpetrator and they were trying to achieve a "close likeness" of what they remembered. In making choices for the composite sketch, Wilkins and Crump selected the same eyes and mouth. At trial, Crump described the right eye in the composite as being a droopy eye because the top of the lid above the eye sags.

Once Wilkins and Crump finished their composites, they each signed a form which indicated the composite was complete, they were satisfied with the result and the likeness was the closest they could come to what they were remembering. At trial, Wilkins testified the composite was "similar" to the shooter. Wilkins explained it "got the eyes right and that was about it. Everything else was so-so ... But not-it was just-everything was kind of pieced, but it wasn't-it was close as it can come at that time." On cross-examination, Wilkins stated that he "was working around the eyes, as close as I can get."

Detective Stevenson interviewed Ricky Burns on July 16. As a result of that interview, Stevenson put together a photographic lineup of six photographs, which included a picture of someone named Eric Bender in position six, and e-mailed the lineup to the Sacramento County Sheriff's Department. That evening, Sacramento County Sheriff's Department Detective David Clegg showed the lineup to Crump and Wilkins separately at their Sacramento apartment. Crump viewed the lineup for about one minute and said "I just can't be sure." Crump testified at trial that the eyes in one of the photos were close, but "there was other traits that didn't look right" and it wasn't the guy. Wilkins viewed the lineup for approximately two minutes. According to Detective Clegg, Wilkins told him it was between photos two and six. Wilkins then covered up all other photos except two and six and said "the eyes look like number two," but he was not sure. At trial, Wilkins testified that number one had a similar hairline and number two's eyes were similar, but he didn't see anyone in that group of pictures that he knew was the shooter.

On July 19, Detective Stevenson interviewed Eric Bender. Bender at first denied having a nickname or moniker, but he later said he once went by "E," although he no longer did. When shown a photograph of Ricky Burns, he stated he did not recognize the person in the photograph or the name.

Bender, who was born in May 1978 and at the time of trial was 28 years old, testified that he was an East Side Crips gang member, but claimed he dropped the affiliation when he was 24 or 25 years old. At the time of Moore's shooting, Bender had a fade haircut and more

than likely was clean-shaven. For many years Bender, who is five feet, four and a half inches tall and weighs about 130 or 135 pounds, has been known as either "Little E" or "Lil E." Ellis Stafford, Bender's much taller half-brother, is called "Big E." From time to time, Bender has simply been called "E." When he was interviewed in July, Bender denied knowing Ricky Burns even after a photo of Burns was shown to him. He does, however, know Burns and addresses him by the nicknames "Big Guy," "Big Dude," or "Big Man." Bender testified at the time of the shooting he lived with his mother in an apartment on H Street in Bakersfield.

Blackmon's assigned parole officer, Jerry Walsh, saw him on July 15. Blackmon, whose date of birth is July 3, 1980, came into the parole office at 2:30 p.m. that day after Officer Walsh left a card at Blackmon's residence at 8:30 that morning instructing him to report there. Blackmon seemed a "little bit ... 'tweaked'," by which Officer Walsh meant he was a little nervous, upset and on edge, like he might be under the influence. Blackmon provided a urine sample, which Officer Walsh took because Blackmon had given an earlier positive test for cocaine. On July 26, Walsh took Blackmon into custody because the July 15 test came back positive for cocaine. As part of the booking process, the officer took a photograph of Blackmon.

For reasons never articulated at trial, officers put together another photographic lineup of six pictures, which included the July 26 picture of Blackmon in position number six. Detective Stevenson showed the lineup to Crump and Wilkins individually on July 26. Crump viewed the lineup between one to three minutes before selecting Blackmon's photograph. Detective Stevenson asked Crump if she was sure and she said she was. At trial, Crump testified that when looking at the photographs, she always looked at the eyes first, and she recognized the shooter "almost instantly" because the eyes were the same. While what drew her attention to the photograph was that his right eyebrow was lifted and right eye sagging a little on top, "the whole picture" looked familiar to her as the person had the same lips, nose and shape of face as the shooter. Crump testified she was 98 percent sure this was the shooter.

According to Detective Stevenson, Wilkins looked at the photographs for a few minutes before selecting Blackmon's photograph. Wilkins testified at trial, however, that when he saw the lineup he "went straight to the guy who did it" and immediately brought it to the detective's attention. Neither Crump nor Wilkins said anything about the person's eyes when they identified Blackmon's photograph. In a subsequent interview, Wilkins told Detective Stevenson that when he first saw the second lineup, he thought two of the photographs in the lineup, number one and number six, looked very similar and were actually of the same person but on different dates. Wilkins said, however, the person in number six was more similar to the person at the time of the shooting and was the person who committed the murder.

A private investigator came to Young's office in Sacramento in May 2006 and showed him six photographs in sequential lineup. When Young was shown the fourth photograph, which was of Blackmon, he said "there's something about the eye." After viewing the remaining two photographs, Young told the investigator "it has been so long and I don't want to identify the wrong person," and "these are just head shots. It would really help to see a full-body photo. As I remember, the guy was skinny and short." At trial, Young testified that one of the pictures stood out to him. When shown the same photographs at trial, Young selected the fourth photograph as the one that looked familiar to him.

On July 26, Stevenson and other Bakersfield police officers searched Blackmon's mother's apartment on Cottonwood Road in Bakersfield. The officers were looking for specific items of clothing, including a blue plaid shirt. Officers found a brown striped shirt, a pair of blue jean shorts, and white tennis shoes.

1

*The Gang Expert*

2          Bakersfield Police Sergeant Greg Jehle, a supervisor in the gang unit, testified as a
gang expert. Bakersfield has roughly 2,000 Crips, split among three major gangs: the East
3   Side Crips, the West Side Crips, and the Country Boy Crips.[FN7] The gasoline station where
Moore was killed is located in an area claimed by the East Side Crips. The street on the west
4   side of the station is the boundary between the East and West Side Crips.

5          FN7. The prosecutor and defense counsel stipulated all three Crips gangs are criminal
          street gangs within the meaning of section 186.22.
6
          The Crips gangs originally wore three different shades of blue: baby or powder blue
7   for the Country Boy Crips; navy blue for the East Side Crips; and turquoise blue for the West
Side Crips. While these color codes were strict in the past, gang members are no longer as
8   rigid in wearing particular colors because the gang law now recognizes that as a method of
identifying gang participants. If a gang member is found hanging out in a rival gang's
9   territory, it is likely a violent act will result. The rival gangs hate each other and are at war.
Gang members retaliate for past shootings of their members.
10
          In 1996, a highly respected member of the East Side Crips, Rodney Sorriell, who had
11   been paralyzed in an earlier drive-by shooting, was killed when two gunmen wearing
Halloween masks shot Sorriell and others who had been participating in a high stakes dice
12   game. Sorriell went by the moniker "E-Double."

13          In Sergeant Jehle's opinion, Blackmon was an active member of the East Side Crips at
the time of the murder. Blackmon claimed membership in the East Side Crips during a
14   January 2000 arrest and an October 2000 field interview. In December 2000, he was arrested
in a known East Side Crip stronghold. In June 2002, Blackmon was shot five times while
15   standing in a known East Side Crip hangout. In February 2004, he was arrested and admitted
his association with the gang, and in April 2004, he was arrested after discarding a revolver
16   while fleeing from the police. Blackmon was in custody from April 17, 2004, until May 11,
2005. Blackmon has tattoos indicating his affiliation with the East Side Crips, including
17   "Lakeview Gangsters" and "East Side 300 Blocc" tattoos. He also has a tattoo that is a tribute
to Sorriell. Blackmon also had written three letters in which he identified himself with the
18   moniker "E-Double" or "Mr. E-Double." In a recorded pre-trial telephone call, Blackmon
referred to himself as "E."
19
          Sergeant Jehle testified Bender is a documented member of the East Side Crips.
20   Sergeant Jehle believed Bender was an active member of the gang at the time of the Moore
shooting. Bender's moniker is "Lil E." He does not have tattoos on his forearms, legs or face.
21   Bender has an extensive criminal history, including the commission of crimes Sergeant Jehle
believed were for the benefit of the East Side Crips.
22
          In 2005, the Country Boy Crips and West Side Crips were in a truce with each other,
23   but both remained at "war" with the East Side Crips, with the predominant rivalry being
between the East Side and Country Boy Crips. When Moore was murdered, he was wearing a
24   shirt that was the bright baby blue color claimed by the Country Boy Crips. In Sergeant
Jehle's opinion, Moore's murder, the attempted murder of Crump, and the possession of the
25   firearm used to commit the crimes, were all committed for the benefit of the shooter's gang,
and Moore died because of the color of his shirt.
26
*The Blackmon Interviews*
27
          Detective Stevenson interviewed Blackmon, who was in custody. Detective
28   Stevenson told Blackmon he wanted to question him about a shooting that took place a week

1    *or so earlier at a gas station and advised Blackmon of his* Miranda [FN8] *rights. Blackmon
2    waived those rights and agreed to speak to the detective.*

3          FN8. *Miranda v. Arizona* (1966) 384 U.S. 436.

4          Blackmon said he knew nothing about the shooting other than seeing something about
     it either on television or in the newspaper. Detective Stevenson asked Blackmon whether he
5    could account for his whereabouts on July 15 at about 1:00 a.m. Blackmon replied he was
     "here and there, by which he meant he was either at his grandmother's apartment or at the
6    house of his girlfriend, Deva Thompson. Blackmon said he was always at one or the other of
     the two locations.
7
          Blackmon initially denied using any moniker or nickname and specifically denied
8    using the moniker "E-Dub." Blackmon later admitted he had taken the name "E-Double"
     after Sorriell's murder, but said he no longer went by that name and claimed the moniker was
9    different than "E-Dub." Blackmon acknowledged he had been a gang member in the past, but
     stated he no longer associated with gang members and decided to leave the gang life after
10   being shot.

11         Detective Stevenson showed Blackmon the composite picture prepared based on
     Wilkins's description of the gunman. Blackmon said he did not believe the sketch looked like
12   him; Detective Stevenson disagreed. Blackmon said he always had some facial hair, but the
     sketch did not show any. Detective Stevenson showed Blackmon a May 11 photograph that
13   showed him with only a thin mustache. Blackmon also said he always wears a hat and the
     composite did not show a hat. Blackmon pointed out that the suspect in the sketch had
14   droopy eyes; Detective Stevenson responded that Blackmon's right eye was droopy.
     Blackmon responded, "Well, that might be true," but stated the left eye in the composite was
15   droopy and his left eye wasn't. Detective Stevenson told Blackmon that witnesses had picked
     his picture out of a photographic lineup. Blackmon said they must have been mistaken, since
16   "all black people look alike." Detective Stevenson told him that one of the witnesses was
     black. Blackmon responded they still must have been mistaken because he wasn't involved.
17   Blackmon said the person who did the shooting must have looked like him and that is why
     the witnesses were mistaken.
18
          Detective Stevenson and Detective Joe Aldana interviewed Blackmon again on July
19   30.[FN9] When shown a picture of Ricky Burns, Blackmon said he looked familiar and it had
     been awhile since he'd last seen him, but denied associating with him. Blackmon told them
20   the last time he had been in the vicinity of the fast-food restaurant, he was with Deva and
     there was a cop behind them. It was at night, but he couldn't remember the exact date,
21   although he said it was probably the previous month. Blackmon said he hadn't been out long
     enough to think about doing anything like this and why would he do some "stupid shit like
22   this" after only being out of the "joint" for two months. Blackmon claimed he was not
     running or hiding from anything, so he didn't keep track of where he was 20 days ago or on
23   any given date. Blackmon denied shooting people and asked why he would shoot someone he
     didn't know. Blackmon told the detectives he was with Deva at 1:15 a.m. on July 15, or he
24   was sleeping at home. When the detectives asked him where he was with Deva, he responded
     he knew "exactly where I was at."
25
          FN9. The interview was recorded and transcribed. A redacted version of the recorded
26        interview was played for the jury and the jurors were given a transcription of the
          interview to help them follow the recording.
27
          Detective Aldana suggested Blackmon was "[g]etting back at the Country for E
28   Double." Detective Stevenson also suggested Blackmon was not telling them where he was at

the time of the shooting because the jail was in lockdown and "you can't get a hold of somebody and say hey, tell 'em I was with you." Finally, Blackmon told the detectives he was at his grandmother's home on Kentucky Street with his grandmother and his brother, Demetrius, at the time of the shooting.

Next, Blackmon told the detectives he got a room with somebody that day, but he couldn't remember where, and the cocaine he used made his mind "cloudy." Then he said, "I don't give a fuck about what Deva tryin' to set no motive so you guys can build a case on it ." Blackmon said he had no reason to shoot the victim because he "ain't even from out here, man," and asked why he would be at the fast-food restaurant at one in the morning. Blackmon told the detectives once again he was having trouble with his memory, and "I was either here or there." The next moment, he said, "Yeah, I believe I was home, man. On fuckin' Kentucky. I believe I was at home. [¶] ... I believe Deva did come get me, I believe she did come get me .... that's what I believe.... I believe she did come get me but I can't remember it, ..." Blackmon believed he saw Deva on the 15th, because he went to a shopping mall with her that day.

Detective Stevenson went to the mall and obtained surveillance videotapes that confirmed Blackmon was there on the morning of July 15.[FN10]

FN10. A composite of the videotape recordings showing Blackmon and Thompson at the mall was played for the jury.

*Defense Case*

Mitchell Eisen, Ph.D., testified for the defense as an expert on memory and suggestibility. Eisen's role was to describe the current state of science in that area, not to offer his opinion as to the accuracy of the witnesses' testimony.

Eisen pointed out that people can only recall events to which they have paid attention and the ability to pay attention is itself limited. Eisen described the basic findings of the scientific community for accurate identification in a photo lineup. First, no one in the array should stick out unduly from the other photos. Second, an identification made in a laboratory environment tends to be significantly more accurate if made within 10 to 12 seconds than an identification made after a longer survey of the photos. There is no correlation between the confidence a person expresses in an identification and the accuracy of the selection.

Bender, who was recalled as a witness, testified that while he was paroled at the H Street apartment, he actually lived with his girlfriend at an apartment on Real Road. On July 16, Bakersfield police seized a blue and white plaid short-sleeve shirt and jean shorts from the H Street apartment. At trial, Bender testified he did not have any clothing at the H Street apartment and he did not recognize the clothing that was seized. Bender claimed his brother, Stafford, lived at the H Street apartment and thought the clothing belonged to him. Counsel for the parties, however, stipulated that Stafford had been continuously incarcerated since August 25, 2003. At trial, Bender denied telling Detective Stevenson he lived at the H Street apartment and denied acknowledging the seized clothing belonged to him.

When Detective Stevenson questioned Bender on July 19, Bender said he was living with his mother on H Street and did not deny the clothing was his, even after being told it would be tested for gunshot residue and blood. But in a second interview on September 13, after Bender was told gunshot residue was found on the shorts, Bender denied the clothes belonged to him and said he hadn't worn any clothes that were at his mother's house in over three years.

Firearms examiner Gregory Laskowski testified the shorts from the H Street

apartment were examined for gunshot residue and a single particle of unburned smokeless gunpowder was found on them. Laskowski also examined two pillows for gunshot residue and found up to two smokeless gunpowder particles on one of the pillows. In Laskowski's opinion, the particle from the shorts and the particles from the pillow were probably from two different ammunition sources, as they were dissimilar. Laskowski could exclude the particles from being from the same cartridge and probably from the same class of cartridge of a particular manufacturer.

The 15-year-old daughter of Blackmon's girlfriend, Deva Thompson, testified that Blackmon wore a hat and jewelry every day. The jewelry included a watch, one or two thick gold necklaces, and a diamond earring. During July 2005, Blackmon was growing a beard, but it was cut short, and a mustache.

Ricky Burns testified he was at the gasoline station that night driving a tan car with a brown fin top. Burns had been drinking at two clubs in East Bakersfield and was on the way home with two young ladies he met that night. They went to the fast-food restaurant to get something to eat. While driving through the station's lot, Burns saw a person walking towards his car. He thought it was "my homie 'Lil E'," so he called out to him and said "What's up, E?" Burns said he was "pretty buzzing." The person nodded in response to the greeting.

Burns drove through the station to place an order at the fast-food restaurant's drive-thru. As he was about to order, Burns heard what sounded like about 12 gunshots. Burns thought someone was shooting at him so he "punched it through" the drive-thru lane and drove around by the gasoline pumps. Burns saw a highway patrol vehicle entering the station. Burns left the station, dropped the young ladies off, and returned to the gasoline station; he was gone for five to ten minutes. Burns parked on the street and walked to the station to see whether "Lil E" had been shot.

Burns talked to police officers and later went to the police department, where Detective Stevenson interviewed him. During that interview, Burns identified a photograph of Bender as the person he saw there that night who he thought was "E." Burns testified at trial that the person he saw the night of the murder who he thought was "E" was short and skinny. The person had short hair, "like a fade," and was in his late twenties or early thirties. Burns thought the man was wearing a jacket and white t-shirt, and he may have been wearing a hat.

As a long-term Bakersfield resident, Burns knows both Blackmon and Bender. Burns explained that all Black people in Bakersfield know one another. Burns knows Blackmon as Teddy, and also calls him Teddy Bear, Teddy Love Bug, Ted, or "T." He has never known Blackmon to go by the name E-Double. Burns did not know how many times he had socialized with Blackmon, but estimated it was "a lot of times." The last time he saw Blackmon before the shooting was "probably at a party or something" within a year before the shooting. Burns testified he did not see Blackmon at the gasoline station just before the gunshots were fired; he thought he saw "Lil E." Burns also testified he told the detectives he was so drunk that night that he wasn't sure who he had seen, but he could tell them "for sure who I thought I'd seen," which was Bender.

The videotape of Burns's interview with Detective Stevenson on July 16 was played for the jury. Burns told Detective Stevenson when he pulled into the fast-food restaurant's parking lot he saw a man wearing yellow shoes jaywalking to the gasoline station from the donut shop across the street. That was when he stopped and thought he saw "my boy 'E'." Burns said "What's up 'E'." Burns described "E" as being short and wearing a "wife beater" under a short-sleeve button-up shirt that was open. Burns didn't see his shoes. Burns did not know why "E" would have waved at him because "E" would not have recognized Burns's car, since Burns had not seen "E" in about three years.

1

2

3

4

5

6

        Officer Daniel McAfee testified that he talked to Burns at the gasoline station the night of the murder and Burns told him he saw an individual there he thought he recognized and believed his name was "E." Burns described the individual as between five feet five and five feet seven inches tall, of small stature, wearing blue jean shorts and a short-sleeve button-up shirt. Officer McAfee also talked to Wilkins on the scene and described Wilkins as being a short, Black male. Wilkins described the shooter as being in his mid-twenties, five feet six inches tall, 150 pounds, and wearing a blue hat, a blue plaid, short-sleeve button down shirt, and white athletic shoes with red striping. Crump told Officer McAfee that the guy who shot her was Black and she got a good look at him. Wilkins also told Officer McAfee he got a "real good look" at the shooter. Young only described the shooter to Officer McAfee as being a Black male.

7

(LD 4:3-19.)

8

**DISCUSSION**

9

## I.  Jurisdiction

10

11

12

13

14

15

16

        Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly, the Court has jurisdiction over the action.

17

18

19

20

21

22

23

        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

24

## II.  Legal Standard of Review

25

26

27

        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

28

        The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

1  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

2  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

3  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

4  application of, clearly established Federal law, as determined by the Supreme Court of the United

5  States" or "resulted in a decision that was based on an unreasonable determination of the facts in

6  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

7  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

8          As a threshold matter, this Court must "first decide what constitutes 'clearly established

9  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

10  quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

11  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

12  of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly

13  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

14  the Supreme Court at the time the state court renders its decision." Id.

15          Finally, this Court must consider whether the state court's decision was "contrary to, or

16  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

17  quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

18  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

19  question of law or if the state court decides a case differently than [the] Court has on a set of

20  materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

21  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

22  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

23  applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

24          "[A] federal court may not issue the writ simply because the court concludes in its

25  independent judgment that the relevant state court decision applied clearly established federal law

26  erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

27  federal habeas court making the "unreasonable application" inquiry should ask whether the state

28  court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

1   Petitioner has the burden of establishing that the decision of the state court is contrary to or

2   involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

3   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

4   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

5   decision is objectively unreasonable.  See <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

6   Cir.1999).

7   AEDPA requires that we give considerable deference to state court decisions. The state

8   court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

9   interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

10  U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

11  **III.  Review of Petition**

12  Petitioner alleges there was insufficient evidence to support the murder conviction. This

13  claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned opinion.

14  (LD 4:19-29.) Petitioner then presented the claim to the California Supreme Court where it was

15  summarily denied. (LD 5, 6.) The California Supreme Court, by its "silent order" denying review of

16  the Fifth DCA's decision, is presumed to have denied the claim presented for the same reasons stated

17  in the opinion of the Fifth DCA.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

18  The Fifth DCA rejected the claim as follows:

19  
20      Blackmon contends the evidence is insufficient to support his convictions because the
        People failed to prove he was the shooter. Although Blackmon acknowledges that Crump,
        Wilkins and Young all positively identified him as the gunman, he contends their
        identifications were not trustworthy. We disagree.

21  
22      Our duty on a challenge to the sufficiency of the evidence is to review the whole
        record in the light most favorable to the judgment for substantial evidence-evidence that is
        reasonable, credible, and of solid value-that could have enabled any rational trier of fact to
23      have found the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443
        U.S. 307, 319; *People v. Prince* (2007) 40 Cal.4th 1179, 1251.) In doing so, we presume in
24      support of the judgment the existence of every fact a reasonable trier of fact could reasonably
        deduce from the evidence. ( *Prince, supra,* at p. 1251.) By that standard of review, applicable
25      to circumstantial evidence and direct evidence alike, substantial evidence of the identification
        of Blackmon as the shooter is in the record. ( *Ibid.*)

26  
27      All three witnesses testified that they saw the shooter's face. Young saw the shooter's
        face and upper body for at least a second as the shooter walked past the SUV. Wilkins saw
        the shooter's face when the shooter glanced over at him as he was walking toward the SUV's
28      open door.[FN11] Crump saw the shooter's face when he pointed the gun at her and fired. While

1    as Blackmon points out Crump told Detective Stevenson that she didn't look at his face that
     much and she testified the gun hid a portion of the shooter's right eye, Detective Stevenson
2    also testified that it was clear to him that she did get a look at his face when he shot at her
     and Crump told an officer at the scene that she got a good look at the shooter. That Wilkins
3    and Crump selected the same eyes and mouth when coming up with their composite drawings
     of the shooter supports the jury's implicit finding that they both saw and remembered the
4    shooter's face.

5        FN11. Wilkins testified that he never took his eyes off the gunman as the gunman
         approached the car and he saw the gunman shoot Moore by looking around the
6        outside of the SUV rather than through the open hatch. Blackmon asserts the security
         videotape does not corroborate this testimony and therefore the testimony is false. We
7        have reviewed the videotape; it does not provide such a clear image of the witnesses'
         positions that it can be said with certainty that the testimony was false. Even if the
8        jury determined Wilkins was mistaken that he looked around the SUV and saw the
         gunman shoot Moore, that does not mean that his testimony that he saw the shooter's
9        face as the shooter was walking towards the SUV was false, particularly since the
         videotape does not disprove this testimony.
10
11       Both Crump and Wilkins picked Blackmon as the shooter when Detective Stevenson
     showed them a photographic lineup on July 26. Notably, neither Crump nor Wilkins selected
12   Bender's photograph as the shooter in the photographic lineup they were shown on July 16.
     While both Crump and Wilkins expressed uncertainty when viewing the first lineup, they
13   explained at trial that there were features on one or two of the photographs that were similar
     to the shooter, but no one in the first lineup was the shooter. Although they both took a
14   minute or more to identify Blackmon as the shooter in the second lineup, and Wilkins
     believed two of the photographs were of the same person, both Wilkins and Crump testified
15   that the person in photograph number six, i.e. Blackmon, was the shooter.

16       All three witnesses commented on an unusual feature of the shooter's eye. Parole
     Officer Walsh agreed Blackmon's right eyelid droops. Blackmon contends the witnesses'
17   failure to mention the droopy eye before Blackmon was identified in the photographic lineup
     calls his identification into question. Crump testified, however, that the composite sketch
18   showed the droopy right eye. When Detective Stevenson showed Blackmon the composite,
     Blackmon acknowledged the sketch showed droopy eyes, but claimed it showed both eyes as
19   droopy while only his right eye was droopy. From this evidence, the jury reasonably could
     conclude that because the sketch shows the droopy eye, which both Wilkins and Crump
20   selected, there was no need to specifically tell the police about the droopy eye.

21       Blackmon argues the following factors render the identifications suspect: (1) the
     witnesses did not notice his tattoos; (2) he normally wears jewelry and a hat, neither of which
22   the witnesses said he wore; and (3) the witnesses noted a lack of facial hair on the shooter.
     These factors, however, do not call the identifications into question. As the security videotape
23   of the shooting shows, the shooter is moving the entire time the witnesses saw him and it is
     unlikely they would have gotten a good look at Blackmon's tattoos. Assuming Blackmon
24   customarily wore a hat and jewelry, he easily could have taken those items off before going
     to the gasoline station that night. Even if he was wearing jewelry, the witnesses would not
25   necessarily have noticed the jewelry. That Blackmon had facial hair when he was arrested on
     July 26 does not mean he had noticeable facial hair on July 15. Crump did not remember any
26   facial hair, but Wilkins described the shooter as having a fine mustache. Parole Officer
     Walsh testified that Blackmon had some facial hair when he saw him on July 15, and he had
27   noticed progressive growth of Blackmon's facial hair between May 17 and July 26; this does
     not mean, however, that he would have had noticeable facial hair other than the thin
28   mustache on July 15. Although Thompson's daughter testified Blackmon was growing a
     beard during July 2005, the jury was free to reject her testimony; we cannot "substitute our

evaluation of a witness' credibility for that of the fact finder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)

In addition to the eyewitness identifications, other evidence tied Blackmon to the shooting. Young testified the shooter's eyes looked "glossy," as if he were on drugs; Blackmon tested "dirty" for drugs the day of the shooting. Blackmon is a verified and admitted member of the East Side Crips criminal street gang; he has gang tattoos and used the moniker "E-Double." Moore was wearing the color of Blackmon's rival gang, the Country Boy Crips, when he was shot and was in East Side Crips "territory." In his recorded interview, Blackmon told Detective Stevenson the last time he had been at the fast-food restaurant he saw police there. In addition, Blackmon was unable to offer a coherent or consistent explanation of where he was when the shooting occurred. During his first interview, he told police he was "here and there" and eventually said he was either at his grandmother's apartment or girlfriend's house. At his recorded interview, he said alternatively he was at his grandmother's home with his brother, he got a room with somebody, he was with his girlfriend, and his mind was cloudy so he was not sure where he was that night.

Blackmon contends the evidence established Bender, not he, was the actual shooter, as Burns identified Bender as the person he saw at the gasoline station's lot prior to the shooting, Bender had the same motive to shoot Moore as Blackmon did since he was also an East Side Crips gang member, and the eyewitness identifications are more consistent with Bender's appearance. Burns's testimony, however, is less than credible. Burns admitted he was so drunk that night that he wasn't sure who he had seen, but he thought he saw Bender, and admitted at one point in his testimony that he did not know if the person he saw was Bender or Blackmon. It appears from the security videotape that the shooter was waving at Burns's car from quite a distance, since Burns's car enters the picture from the same direction the shooter is waving toward. In an interview with Detective Stevenson, Burns stated he did not know why the shooter was waving at him and he didn't know how Bender would know his car, since he hadn't seen Bender in about three years. The jury was free to reject his testimony; it is not our role to reevaluate the testimony and credibility of witnesses. (*People v. Koontz, supra,* 27 Cal.4th at p. 1078.)

While Bender may have had features similar to the shooter's and the same motive for the murder, the eyewitnesses identified Blackmon as the shooter. The jury obviously found these witnesses to be credible. Blackmon's argument is, in essence, a request that we reweigh the evidence, which we cannot do. Instead we conclude his identification as the shooter is supported by substantial evidence.

(LD 5: 5-8.)

In reviewing insufficiency of evidence claims, California courts expressly follow the <u>Jackson</u> standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). <u>See</u> <u>People v. Johnson</u>, 26 Cal.3d 557, 575-578 (1980); <u>see also</u> <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in <u>Jackson</u>, the test in determining whether a factual finding is fairly supported by the record is as follows:

"[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

<u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).

1   This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

2   § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness

3   applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v.

4   Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

5   state court determinations of legal questions or mixed questions of law and fact, the facts as found by

6   the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455

7   U.S. 539, 597 (1981).

8        In this case, the state court correctly applied Supreme Court precedent in determining there

9   was substantial evidence from which any rational trier of fact could have concluded Petitioner was

10  the shooter. As recited above, the evidence included testimony from three eyewitnesses to the

11  shooting who stated they saw the shooter's face. There was also evidence that Petitioner looked like

12  he was on drugs. When tested, it was confirmed that Petitioner was on drugs on the day of the

13  shooting. There was evidence that Petitioner was a verified member of a criminal street gang, and the

14  victim was in Petitioner's gang's "territory" wearing the colors of a rival street gang during the

15  incident. In addition, Petitioner's several statements to police were conflicting and inconsistent.

16  Further, the evidence that Petitioner points to in support of his contention that another committed the

17  shooting was from a witness who was less than credible.  Given the overwhelming evidence in this

18  case, the Court finds that the state court reasonably determined there was substantial evidence from

19  which the jury could conclude Petitioner committed the murder. Accordingly, the state court decision

20  was not an unreasonable application of Jackson and the claim should be denied.

**RECOMMENDATION**

22       Accordingly, IT IS HEREBY RECOMMENDED that the petition for a writ of habeas corpus

23  be DENIED WITH PREJUDICE. It is FURTHER RECOMMENDED that the Clerk of Court be

24  DIRECTED to enter judgment.

25       This Findings and Recommendation is submitted to the assigned District Judge, pursuant to

26  the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days after being served with the

27  Findings and Recommendation, any party may file written objections with the Court and serve a

28  copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's

1   Findings and Recommendation."  Any reply to the objections shall be served and filed within ten

2   days after service of the objections.  The parties are advised that failure to file objections within the

3   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d

4   1153 (9th Cir. 1991).

5

6   IT IS SO ORDERED.

7   **Dated:    November 25, 2009**              **/s/ Sandra M. Snyder**
                                       UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28